NEW . YORK COUNTY.—HON. D. G. ROLLINS, SURRO-
GATE.—June, 1885.

KNAPP *v.* REILLY.

*In the matter of the application for revocation of
probate of the will of* PATRICK J. O'NEILL, *de-
ceased.*

Where, upon an application to revoke a decree admitting a will to probate,
the court finds *grave reason to doubt* whether, at the date of the
alleged execution, decedent was physically and mentally capable of
participating in the essential formalities, and whether he subscribed
the instrument according to law, the prayer of the petition should be
granted.

The signatures of attesting witnesses are effectual, in this State, only
where preceded, in point of time, by the signature of the testator.

It appeared that decedent, at the time of the alleged execution of his will,
was, from long continued sickness, in a state of chronic stupor, from
which he could be awakened, but into which he would speedily relapse,
the interval of lucidity being too brief for any considerable mental
exertion ; that, of the subscription to the instrument,—which was in
the following form : "Patrick [his + mark] J. O'Neill,"—decedent
wrote only the first three letters, and then dropped the pen, saying he
could go no further ; whereupon R. proceeded to make the mark and
complete the signature. There was no evidence of a request by de-
cedent to R., so to do, nor of a subsequent indication of knowledge or
approbation, on the part of the former, of what had been done.—

*Held,* that the act of R. did not constitute a subscription of decedent's
name, and that the fragmentary signature written by the latter was
not sufficient as an authentication of his will.

PETITION for the revocation of probate of dece-
dent's will, presented by Mary Knapp, one of his
next of kin, and a legatee under the will; opposed
by James A. Reilly, the executor thereof. The facts
appear sufficiently in the opinion.

I. GRAY BOYD, *for petitioner.*

JAMES F. HIGGINS, *for respondent.*

THE SURROGATE.— This is a proceeding for revocation of the probate of a paper that was lately adjudged to be the will of Patrick J. O'Neill. As was held in Hoyt v. Jackson (2 *Dem.*, 446), the decree heretofore entered must stand or fall, accordingly as this respondent has established or failed to establish to the satisfaction of the Surrogate that, within the meaning of § 2623 of the Code of Civil Procedure, the paper in dispute was duly executed, and that, at the time of executing it, its maker was in all respects competent to make a will, and was free from undue influence and restraint. In a proceeding for revocation, no less than in a proceeding for the grant of probate, the burden of proof is upon the party who seeks to uphold the will. If, therefore, upon all the testimony the *factum* is left in a state of uncertainty, probate should always be denied, or, if it has been theretofore accorded, should be set aside (Howland v. Taylor, 53 *N. Y.*, 627).

In the case at bar, I find grave reason to doubt

1*st*. Whether on January 16th, 1885, the date of the instrument here in controversy, this decedent was physically and mentally able to participate in the essential formalities of its execution ; and

2*d*. Whether such instrument was subscribed by him according to law.

*First.*—Was the decedent, when this paper is claimed to have become a will, able to execute it? The disability under which he suffered, if he suffered under any disability at all, was not in the nature of insanity, as that word is commonly understood in trials of testamentary causes ; it was simply an ina-

bility, by reason of long continued disease, in which his brain had at last become involved, to exert certain faculties without which one cannot be deemed, in the eye of the law, a person of sound disposing mind, memory and understanding.  His condition is thus described by one of the attesting witnesses:  "He was in a doze . . . . . in a kind of sleepy, comatose state all the time.  If you were talking to him, he would fall off to sleep. . . . . . The day before (meaning the day before the execution), I went for the priest for him, for I thought he was going then." Said another witness, a sister of decedent:  "He was sleepy . . . . . in a dazed condition . . . . . sometimes he did not even know his child—while I was giving medicine to him he was going to sleep, and did not know that I had given it to him."

Still another witness testified that, about the time the will purports to have been executed, the testator "seemed stupid; he would look at you with a kind of look, and would not appear to recognize you; he did not seem to understand anything that people were talking to him about; he was in a dazed and drowsy condition, and incapable of transacting business."  The progress of the disease, which resulted in decedent's death, was detailed by his attending physician, Dr. Buck, who visited him daily during the last two months of his life.  From Dr. Buck's testimony, it is apparent that his patient, for about a week prior to his death, including the two days when the will is claimed to have been prepared and authenticated, was incapable of sufficient thought, reflection and judgment to project or execute a testamentary

paper.   He was in a state of stupor, from which he could at times be awakened, but into which he would speedily relapse, the interval of lucidity being too brief for any considerable mental exertion.   "By shaking him and rousing him," said the doctor, "I could make him look up and recognize me; but if I asked him a question, I could not get a satisfactory answer."

The only testimony at variance with that above summarized was given by Reilly, the proponent.   It is of a negative character, and it by no means serves to remove my doubts as to the decedent's competency.   Of the two questions, therefore, that I have set myself to answer, the first must be answered in the negative.

*Second.*—Even if the evidence satisfactorily established O'Neill's testamentary capacity, I should feel bound to revoke the probate of his alleged will, on account of irregularities in its execution.   The writing, which is claimed to constitute the "subscription" required by law, is in its proper place, at the end of the *testimonium* clause, and is as follows: "Patrick [his + mark] J. O'Neill."   A portion of this name, and a portion only, was written by the decedent himself.   The witness Murray says that, when Patrick had finished the letter "t," the pen dropped from his hand, and he said he could not go any further. Murray testified that Reilly then proceeded to make the "+" mark, and to finish the signature.   The other attesting witness confirms Murray, as to the dropping of the pen from decedent's hand, but says nothing as to who made the mark.   Reilly's version

of the incident is in these words: "He (meaning the decedent) attempted to sign and failed, but he made his mark, and I wrote the balance of the name."

The conflict between these statements must, in my judgment, be settled in favor of Murray, upon the corroborative evidence afforded by the paper itself; for the mark in question has very noticeable characteristics of Reilly's handwriting, and is conspicuously unlike the decedent's. This, however, is not of itself a fatal defect; for, even though made by Reilly, the mark would suffice as the subscription of the decedent, if it appeared that, in making it, Reilly acted under decedent's directions, and that, in the presence of the attesting witnesses, the decedent acknowledged it as his signature (Chaffee v. Bapt. Miss. Conv., 10 *Paige*, 85; Van Hanswyck v. Wiese, 44 *Barb.*, 494; Robins v. Coryell, 27 *Barb.*, 556); but the case is barren of evidence tending to show that the decedent requested Reilly to take up the pen that had fallen from his own grasp, or that, after Reilly had made the mark and completed the signature, the decedent indicated to the attesting witnesses that what had been done had been done with his knowledge and approbation. In view of this fact, can it be said that the paper was duly subscribed? I think not. Reilly's act did not constitute a subscription, and such portion of the word "Patrick" as was written by decedent himself does not serve for a sufficient signature; for his relinquishing of the pen before he had completed the task he had undertaken was evidently due to physical weakness, and not to a purpose on

his part to treat, and to have the witnesses treat, the fragmentary signature already written as the authentication of his will.

I feel bound to find, also, that the names of the attesting witnesses, as they now appear on this paper, were written before the decedent made the abortive effort to attach his signature. Both those witnesses profess to have a distinct recollection that such is the case. The proponent swears to the contrary. Now, if he were a lawyer, and experienced in the matter of the execution of wills, and if it appeared that, on the 16th of January, he knew that the signatures of attesting witnesses are only effectual in this State, when preceded in point of time by the signature of the testator (Jackson v. Jackson, 39 N. Y., 153; Sisters of Charity v. Kelly, 67 N. Y., 409), I might accept his story of the sequence of events, in preference to that of the other witnesses; but, in the absence of these reasons for crediting him with special accuracy of recollection, I accept the statements of Murray and O'Neill, as to the order of signing.

While I have decided upon the grounds above stated, to revoke probate, I think it but fair to proponent to say that the allegations of the petition which charge him with fraudulent practices are not sustained. I greatly doubt whether the decedent, on either the 15th or 16th of January, understood that his interviews with Reilly related to the preparation or execution of a will. I believe that, so far as he had any notion at all as to why Reilly had been summoned to his sick room, he supposed that it was for

the adjustment of the dispute about furniture which is fully described in the evidence.   On the other hand, I can well understand how Reilly might naturally have understood, from what he saw and heard upon his first visit to the decedent, that he was expected to prepare a will.   He and the O'Neills were evidently acting at cross purposes, and, though there is some conflict in the testimony which can scarcely be reconciled with a disposition on the part of all the witnesses to reveal the truth, the facts that I accept as proved call for no adverse criticism upon the motives or the conduct of any persons interested in these proceedings.

Probate revoked.